# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
v.

JOHN GOCI

Case: 2:12-mj-30516
Judge: Unassigned,
Filed: 08-20-2012 At 04:08 PM
SEALED MATTER (LCB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 17, 2012 _____ in the county of _____ Wayne _____ in the _____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. section 1001 | defendant knowingly and willfully made materially false and fraudulent statements in a matter within the jurisdiction of the executive branch of the United States government |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Jeffrey Jacobs, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 20, 2012

_____
Judge's signature

City and state: Detroit, Michigan

Hon. Mona K. Majzoub, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

Jeffrey Jacobs, being duly sworn states:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. My duties include the investigation of various violations of federal criminal law, including making extortionate extensions of credit, financing extortionate extensions of credit, and collecting extensions of credit by extortionate means, more commonly referred to as "loan sharking," in violation of 18 U.S.C. §§ 892, 893 and 894.

2. The statements contained in this Affidavit are based in part on information provided by other FBI Special Agents, local law enforcement officers, witnesses, my observations and experience. I have not included all the facts known about the case, but only those necessary to establish probable cause that JOHN GOCI has violated of Title 18, United States Code, Section 1001 – making false material statements to federal agents.

3. A cooperating witness (CW) has been providing information concerning Tomo Duhanaj for a number of months. This information is particularly reliable in that many of the statements made by CW are against CW's penal interests and tend to incriminate CW along with Duhanaj. CW's information has also been corroborated by other cooperating witnesses, surveillance, and statements and actions of Tomo Duhanaj. CW has advised me and other FBI Special Agents that Tomo Duhanaj makes high interest loans over 25% within the Albanian community in metropolitan Detroit. CW believed that these loans were extended with the threat of violence if they were not repaid. The CW stated that Duhanaj was guaranteed repayment because the Albanian Community knew him as killer. According to CW, Tomo told him/her that no one yet had failed to repay him.

4. On May 30, 2012, Duhanaj was pulled over in a traffic stop by the Troy Police Department. He was arrested for driving on a suspended license and his car was impounded. In a search of his person, two checks were found with the payee line left blank. These checks were from Enver Jusufi and John GOCI. The amount of Jusufi's check was $1,375 and for GOCI's check was

1

$2,700. Duhanaj also possessed a sheet of paper with "Outstanding Payments, Tom DUHANAJ" detailing a set of extensions of credit for February 2012, including loans to John GOCI, Enver Jusufi (referred to as Ala on this sheet) and others. This sheet of paper was provided to the FBI by the Troy Police Department. An FBI Forensic Accountant reviewed the list and determined that many of the loans detailed on the sheet appear to be in excess of 45% interest per annum, including those made to GOCI and Jusufi (a/k/a Ala).

5. On July 17, 2012, I along with Special Agent Pejman Arab from Homeland Security Investigations, interviewed JOHN GOCI at a Starbucks coffee shop in Westland, Michigan. SA Arab introduced the agents as Federal Agents. TFO Arab then identified himself as a special agent with Homeland Security and me, SA Jacobs, as his partner. SA Jacobs also identified himself as a Special Agent. We did not specifically mention the FBI so as not to alert Duhanaj and GOCI to the FBI's interest in the matter, although GOCI was clearly informed that he was speaking to federal agents. At the time of the interview, GOCI did not know that I and SA Arab had received and were aware of the contents of the list of loans discovered by the Troy Police Department on May 30, 2012, which included the details of GOCI's outstanding loan with the Duhanaj loan sharking conspiracy.

6. GOCI advised that he was aware that on May 30, 2012, Duhanaj was pulled over by the Troy Police Department (TPD), and he had in his possession a check written out by GOCI with the payee line left blank. GOCI stated that he was unaware that Duhanaj had been arrested during the incident. However, pursuant to a court authorized wiretap, on June 1, 2012 a conversation between GOCI and Duhanaj was intercepted. During this call, Duhanaj informed GOCI that he had been arrested by Troy Police Department for driving without a license in the above-referenced incident. The intercepted conversations referenced in this affidavit were sometimes in English, sometimes in a foreign language, and sometimes alternated between English and a foreign language. The foreign language portions of the conversations have been translated by certified FBI translators in the appropriate language, which translations have been provided to me.

2

7. GOCI explained that the check represented two payments for a personal loan he took out with Duhanaj, which was financed by Randy (last name unknown). (I know from my investigation of this case that the Randy referred to by DUHANAJ is RANDY DZIERZAWSKI.) GOCI believed Randy's last name was Polish. Since GOCI was not able to spell Randy's last name, he left the payment checks blank. GOCI told us that he received the loan about eight months ago from Duhanaj. According to GOCI, there was no paper work for the loan; it was based on a hand shake and a personal guarantee and no collateral was needed or given. GOCI stated that there were no set terms for the loan, but later added that he was supposed to pay it back within one year. GOCI claimed that the interest rate on the loan is fifteen percent (15%) per annum and that the payments are $1,350 per month, which he pays every month or other month. (Your affiant notes that the represented monthly payment amount, term and interest would correspond approximately to a $15,000 loan.)

8. As described above, however, the analysis by a FBI Forensic Accountant of the "Outstanding Payments, Tom DUHANAJ" sheet, revealed that GOCI's loan was in excess of 45%, not 15% as claimed by GOCI. The line for GOCI on the sheet listed "John GOCI, $30,000, 1,375.00, Beg. Oct 1, 2011 ending Sept 1, 2015." This was deciphered by our accountant to indicate that John GOCI obtained a $30,000 loan with a payment of $1,375 per month, beginning in October 1, 2011 and ending on September 1, 2015. This indicates that there were in fact terms for GOCI's loan, contrary to his statement that there were not, and GOCI had until 2015 to pay back his loan. Also, as evidenced by the check seized from Duhanaj and the document, GOCI's monthly payments were $1,375, not $1,350. (A principal and interest payment of $1,375 for 4 years on a $30,000 loan corresponds to an interest charge of approximately 46% per annum.) I know from my training and experience, and the training and experience of other FBI Special Agents with whom I have consulted, that interest rates in excess of 45% are typical of loan sharking operations. In fact, Congress has specifically recognized the 45% figure as being prima facie indicative of extortionate extensions of credit at 18 U.S.C. § 892(b)2). The circumstances

3

indicate that GOCI lied about this interest rate to assist Duhanaj in concealing the criminality of his loan sharking operation.

9.  GOCI was asked if he had been coached by anyone or instructed on what to say to law enforcement regarding this interview or if questioned regarding his loan, to which he answered no. The following telephonic intercepts demonstrate that GOCI had in fact been coached and instructed by Duhanaj on what false statements he should provide to law enforcement regarding his loan.

10.  On July 13, 2012, four days before our interview with GOCI, a call between GOCI and Tomo Duhanaj was intercepted. During the conversation the following was stated:

TOMO:   Eh, there was at my house today Homeland Security.

JOHN:   Uh-huh.

TOMO:   Reason why they was, is ah, because they say for those two checks that raise the red flag with my name.

JOHN:   Uh-huh.

TOMO:   And it goes they askin' me questions I think so what is this, this, they want to see if we have a the same story or not like we talked with the Troy police or something, and they asked for your name, I say yes, John GOCI [unintelligible] Jusufi, the other one. Reason why they said leave it blank is because they can't pronounce the guy's name or the company name. And, did the guy sign any papers when they got the loan, I said no because I personally guaranteed, guarantee it because they are friend of mine. When they got the loan, I told them after the New Years. How many percentage, 15 percent. They asked me can I have the names and numbers, I said sure. Can I call, can we call them, I said sure you can call them, its Ok country, I said why

4

|  |  |
|---|---|
|  | not, give them a call. So, if they call you, this is the reason they gonna call you. |
| JOHN: | Um-kay. |
| TOMO: | Ok, brother? |
| JOHN: | Did you already tell them that, ah, we were already... |
| TOMO: | Exactly, exactly how, how we talked to the Troy police, same story. [unintelligible] Exactly how was it. |
| JOHN: | Hmm. Um-kay. |
| TOMO: | Ok, brother. |
| JOHN: | Alright, thanks. |
| TOMO: | Talk to you. |
| JOHN: | Bye. |
| TOMO: | Bu-bye. |

Thus Duhanaj advised GOCI that GOCI should tell the same false story to the federal agents as he had previously told the Troy Police Department.

11. On June 1, 2012, conversations between GOCI and Duhanaj were captured. Duhanaj explained that the check GOCI had given him with the "payable to who" section left blank had been seized by the police, when DUHANAJ was pulled over and arrested for driving with a suspended license. Duhanaj advised that on Monday either he or the detective will contact GOCI. Duhanaj stated "... you're going to tell him, yes I don't know how to spell his name, I give it to him loan of $2,700 and all set." Duhanaj advised "the same thing I going to do with Enveri and everything else....." On June 4, 2012, a call between Duhanaj and GOCI was intercepted. Duhanaj advised that he (detective) will be calling GOCI. Duhanaj coached GOCI to say he "took a thirty thousand dollars loan," and "Tommy has a friend who works with him. His name is RANDY." Duhanaj also advised GOCI to

5

state that the interest rate was 15% and that he has had the loan less than a year.

12. In addition to the paperwork seized from Duhanaj, the FBI Forensic Accountant's analysis of the document, and the above intercepts, the falsity of GOCI's statements to SA Arab and me is also demonstrated by the following intercepted conversation between Duhanaj and Randy, as they attempt to reconcile their false statements with the mathematical reality of the blank check amounts. On June 4, 2012, at 3:50 p.m, Randy Dzierzawski called Tomo Duhanaj to continue a discussion of what Duhanaj and GOCI had told and were going to tell the police about the loans. Randy asked Duhanaj if it has to be 15%, because it's not going to work out that way. TOMO stated yes, because he already told them fifteen percent. RANDY advised that he can't make it come out to fifteen percent. They discuss *changing the lease length and adding a late fee to make it work out to 15%.* Randy advised he would call back with numbers. At 4:03 p.m. the same day, Randy called Duhanaj back and provided the loan terms that work out to the correct payment: 27 months, a little over 15% interest, yielding a $1,300 payment, with a $75 late fee to get to $1,375. Also during the conversation, TOMO suggested that *they can fabricate paper work later on if necessary.*

13. I am aware through my investigation that JOHN GOCI was recently running for the U.S. House of Representatives, but lost in the August primary to Congressman John Conyers. I am also aware that Tomo Duhanaj is an alien who has been ordered deported from the United States.

14. On June 26, 2012, the FBI intercepted a telephone call from GOCI to Duhanaj wherein GOCI requests Duhanaj's assistance as the President of Shoqata (association) Kosova. GOCI asked for Duhanaj's support for a fundraiser at St. Paul's for his campaign, to which Duhanaj replied that he would definitely help. GOCI also asked if there was a phone list to call people about the fundraiser, to which Duhanaj replied he would try to find one. On July 8, 2012, during a conversation between GOCI and Duhanaj, GOCI asks if Duhanaj can "make some calls to some people." DUHANAJ replies that he already did and somebody gave

6

him $250 to give to GOCI. On July 10, 2012, GOCI is intercepted asking for Duhanaj's help with his campaign advertising cost. GOCI instructs Duhanaj that he will need to inform the people about where their money (contributions) is going. Duhanaj states he will try to help as much as he can.

15. On July 17, 2012, after his interview with me and Special Agent Arab, GOCI called Duhanaj to report to him about the interview. Duhanaj then tells GOCI that tonight they are having a meeting at the church to "see what we can do." GOCI gives his appreciation and states "whatever you guys can do, it is now or never." Duhanaj is later overheard on an intercept contacting an individual to advise him that on Saturday, they will have a cocktail party for John GOCI at Nduo's church. DUHANAJ explains that it is a fundraiser for GOCI's bid to become a Congressman.

16. During GOCI's interview, he also told me and SA Arab that he was unaware of Duhanaj's reputation for intimidation and toughness in the Albanian community. GOCI stated that he had no fear of Duhanaj and that he (GOCI) would not be afraid to take Duhanaj on physically. (This inquiry was relevant to show that Duhanaj had a reputation within the Albanian community for violent, threatening or intimidating collection methods. See 18 U.S.C. § 894(c)). GOCI falsely denied this as evidenced below. On April 29, 2012, a call between GOCI and Duhanaj was intercepted wherein GOCI advises that he is in New York for the Vatra celebration. GOCI complains that he is not allowed to pass out his literature and that a certain individual is not donating any money for his campaign: "Oh, great, he donated money to this guy and that guy, but now that there's an Albanian that's running that's got a shot and he's donated nothing to him." Later in the conversation, Duhanaj states, "I wish I was there to help you something man." GOCI replies, "I know, it'd be nice to have some muscle here. I got my boy from Texas over here, but it'd be nice to have somebody from Detroit (laughs) squeezing [expletive] (laughs)."

7

Therefore, there is probable cause to believe that JOHN GOCI has knowingly and willfully made materially false statements in a matter within the jurisdiction of the executive branch of the U.S. government, in violation of 18 U.S.C. § 1001(a)(2).

*[signature]*
Jeffrey Jacobs
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 20th day of August, 2012

*[signature]*
Hon. Mona K. Mazjoub

United States Magistrate Judge

8